# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**ESTHER MONDRAGON,**

     **Plaintiff,**

vs.                                                                                                     Civ. No. 01-899 WJ/RLP

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

     **Defendant.**

## UNITED STATES MAGISTRATE JUDGE'S
## ANALYSIS AND RECOMMENDED DISPOSITION[1]

### Factual background

1.     Plaintiff, Esther Mondragon ("Plaintiff" herein) sustained gunshot wounds to her right wrist and thigh during a domestic violence incident on August 21, 1998. She has permanent nerve and tendon damage to her right hand with resultant manipulative limitations.[2] (Tr. 96, 165, 175, 178, 221). The gunshot wound to her right thigh fractured the femur. (Tr. 96). By March 1999 she was weight bearing with a cane, and by June 1999 carried a cane but did not use it for weight bearing. (Tr. 221, 207-209).

2.     In addition to her physical injuries, Plaintiff suffers from Post Traumatic Stress Disorder, Major Depressive Disorder and Personality Disorder not otherwise specified. (Tr. 207-209). A

---

[1] Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

[2] At an orthopedic examination of March 3, 1999, Plaintiff's hand remained painful, with tingling and decreased sensation to light touch, positive Tinel's sign and skin changes consistent with denervation. She was unable to cross her fingers. She was advised her hand would never be normal. (Tr. 221).

psychological evaluation conducted on September 9, 1998, while she was at a rehabilitation center, contained a limited mental status exam which described her as oriented x 3, without suicidal ideation, and with feelings of depression that vacillated from none to severe. (Tr. 132). The treating psychiatrist assigned a global assessment of functioning ("GAF," herein) of 47, indicative of "(s)erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . ." *American Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders* at 32 (4th ed. 1994)(DSM-IV).

3. Plaintiff moved to a battered women's center on September 18, 1998. (Tr. 227). She began receiving medical and psychological care at Healthcare for the Homeless ("HCH," herein), and orthopedic care at the University of New Mexico Hospital. ("UNMH," herein). Plaintiff was placed on Zoloft, an anti-depressant, in October 1998 (Tr. 194). Her symptoms of depression decreased over time:

| | |
|---|---|
| 10/1/98 | Complains of some depression, affect a bit flat (Tr. 204). |
| 10/8/98 | Weeping continuously during interview. Eye contact minimal. Speech coherent and goal directed. (Tr. 202). |
| 10/13/98 | Depressed, anxious/nervousness, "not feeling anything," decreased energy, sleep, motivation, vague suicidal ideation without specific plan, "spacing out." (Tr. 194). |
| 10/14/98 | Complaining of confusion, inability to concentrate . . assured these are function of depression and can be ameliorated. Appetite is improved. no tears, eye contact improved, speech coherent and goal directed. Appears less dysphoric. (Tr. 201). |
| 10/27/98 | Medical follow up following initiation of Zoloft for depression. Tearful and smiling responsively, though mood and affect and content still depressive. (Tr. 200). |
| 10/28/98 | Affect improved over 10/14 visit. Smiles spontaneously. (Tr. 198). |

> 12/3/98    Mental status exam improved. Now smiling responsively and decreased depression/hopelessness. (Tr. 193).

There is no indication that Plaintiff received mental health treatment or counseling at HCH after December 1998.

4. Plaintiff was evaluated by Robert Hillman, M.D., a consulting psychiatrist, on June 14, 1999. (Tr. 207-209). At that time she was taking Zoloft, "on an irregular basis." In addition to physical problems, Plaintiff complained of constant thoughts of the shooting incident, flashbacks, anxiety, depression, suicidal ideation without plan, crying spells and insomnia. She complained of difficulty being in public, but also stated that on a typical day, she drove to doctor's appointments or ran errands. Dr. Hillman conducted a mental status examination summarized as follows:

> General appearance:  Neatly dressed, well-nourished. Interested in proceedings. Felt to be alert, oriented, cooperative and a good historian. Uses cane without bearing any weight on cane.
>
> Speech & Stream of Talk: Speech slightly lower than normal in volume, but normal in rate. Smooth without evidence of hesitation, stuttering, stammering or blocking.
>
> Emotional Reaction & Mood: Appears moderately depressed. Affect blunted. Range of mood during interview appropriate to material under discussion.
>
> Perception: No evidence of auditory or visual hallucinations.
>
> Thought Content: No loose associations or inappropriate affect.
>
> Cognitive Functioning: Oriented to time, place, person and circumstances. Recent and remote memory intact. Attention and recall unimpaired. Of average intelligence. Fund of information adequate. Fairly good insight into illness and need for appropriate treatment.

(Tr. 208).

Dr. Hillman diagnosed chronic PTSD, Major Depressive Disorder, Personality Disorder NOS, and assigned a GAF of 60, indicative of "(m)oderate symptoms . . . OR moderate difficulty in social,

occupational or school functioning . . ." *DMS-IV*, at 32. Dr. Hillman indicated that parts of Plaintiff's life were under fairly good control, citing to her ability to drive and keep her appointment with him. Other parts, obtaining needed psychiatric care and consistently taking medications, were not in good control. He referred her to a community guidance center for psychiatric follow up. (Tr. 209). There is no evidence that Plaintiff's followed up on this recommendation.

5. At her administrative hearing on January 18, 2000, Plaintiff testified that she had run out of medication for depression a couple of months earlier, but would take them again if re-prescribed. (Tr. 289). She also stated that she had not received psychological care for a couple of months, and was trying to get set up for counseling. (Tr. 295-296). She complained of recurring thoughts, daily crying, poor memory, poor concentration and disorientation. (Tr. 297-298, 307-308). In written materials, she indicated that she had no problems getting along with family, friends, those in authority, or supervisors, and that she was able to accept work place changes. (Tr. 72,74).

6. Plaintiff was treated for complaints of chronic pain at HCH. She attended no pain clinic sessions from late October 1998 until March 1999, when she was seen on two occasions for pain in the right hip and neck extending to the low back. (Tr. 191). She failed to appear for her following two appointments. (Tr. 191). Plaintiff was taking no pain medication at the time of her administrative hearing. (Tr. 288).

7. In addition to problems directly related to the shooting incident, Plaintiff has a long standing urological problem which was diagnosed in January 1999 as detrusor muscle instability. (Tr. 93, 122, 206, 203, 194, 201, 163, 224). This was treated with prescription medication and a request that Plaintiff return for follow-up in two months. (Tr. 224). No further evaluation of or treatment for her bladder complaints is documented in the medical record. In January 2000 Plaintiff testified that she

had stopped taking the prescription medication on the recommendation of an acupuncturist who recommended herbs and cranberry pills. (Tr. 293-294). The ALJ determined that Plaintiff's urinary disorder was manageable with prescribed medication and treatment. (Tr. 16-17). Plaintiff does not challenge this determination.

8. Plaintiff's activities include dressing, washing, grocery and other shopping, vacuuming, sweeping, laundry, dishes, some cooking, making her bed, driving, reading, watching TV and listening to radio. (Tr. 302-305, 77).

## ALJ's Decision

9. The ALJ denied Plaintiff's claim, finding that: (1) her mental impairment was not severe for the requisite 12 month durational period; (2) she was not fully credible; (3) she retained the residual functional capacity for less than the full range of light work, and (4) She was capable of performing the jobs of Information Clerk and Surveillance Monitor.

## Issues presented

10. Plaintiff raises three issues on appeal:

(1) Whether the ALJ applied proper legal standard in evaluating Plaintiff's mental impairment; and whether his determination that Plaintiff's mental impairment ceased to being "severe" in June 1999 is supported by substantial evidence;

(2) Whether substantial evidence supports the ALJ's determination that Plaintiff's testimony was not credible, and.

(3) Whether the ALJ applied proper legal standards at step five of the sequential evaluation process, and whether his determination that Plaintiff could perform the jobs of information clerk and/or surveillance monitor is supported by substantial evidence.

**Legal Standard**

11.     This Court reviews the Commissioner's decision to determine "whether it is supported by substantial evidence and whether the [Commissioner] applied the correct legal standards." *See Washington v. Shalala,* 37 F.3d 1437, 1439 (10th Cir. 1994). Substantial evidence while "more than a mere scintilla," is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In conducting this review, I may not reweigh the evidence or substitute my judgment for that of the Commissioner. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991).

**Analysis**

**I.    The ALJ Applied Correct Legal Principles in Assessing Plaintiff's Mental Impairment, and His Decision Is Supported by Substantial Evidence.**

12.     The ALJ determined that as of June 1999 Plaintiff's mental impairment only slightly restricted the activities of daily living and social functioning; seldom affected concentration, persistence, or pace in work settings; and never resulted in episodes of deterioration or decompensation. (Tr. 16, 25). The regulations provide that a finding of "no severe mental impairment" is proper upon such ratings. §20 C.F.R. 404.920a(d)(1). If the ALJ's ratings are supported by substantial evidence, his decision must be upheld.

13.     In support of his conclusion that Plaintiff's mental impairment was not severe as of June 1999, the ALJ cited to Plaintiff's medical records, not just to the GAF rating assigned by Dr. Hillman:

> . . . (C)onsultative examination performed in June 1999 . . . demonstrated that there is moderate depression, post traumatic stress disorder, and personality disorder not otherwise specified, but not at a level to impede work activity as GAF of 60 is now

> reported . . . (Tr. 14)
>
> Healthcare for the Homeless records spans (sic) a period from September 1998 through August 1999. Medical entries indicate pain and depression are alleged with improvement in major depression and post traumatic stress disorder by October 1998 . . . (Tr. 15)
>
> The examination (by Dr. Hillman) revealed no significant abnormalities as the claimant was oriented with intact remote and recent memory, and no impairment in attention, and average intelligence. (Tr. 16).

The ALJ also referred to Plaintiff's description of her daily activities (Tr. 16) and the Psychiatric Review Technique Form completed by non-examining psychologist, G.W. Sutton, PhD. (Tr. 17, 211). See Social Security Ruling 96-6p, 1996 WL 374180, *1.

14. The ALJ's finding that Plaintiff's mental impairment was no longer "severe" as of June 1999 is supported by substantial evidence.

## II. The ALJ Did Not Err in Assessing Plaintiff's Credibility.

15. The determination of credibility is the provence of the ALJ. *Musgrave v. Sullivan*, 966 F.2d 1371, 1376 (10th Cir. 1992). In evaluating a claimant's credibility the ALJ should consider factors such as

> "levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contact, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective evidence."

*Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991), (quoting *Huston v. Bowen*, 838 F.2d 1125, 1132 and n. 7 (10th Cir. 1988); *accord, Luna v. Bowen*, 834 F.2d 161, 165-166 (10th Cir. 1987). The ALJ's credibility findings must be linked to specific evidence. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). The ALJ is not required, however, to prepare "a formalistic factor-by-factor

recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

16. The ALJ stated the following reasons for rejecting Plaintiff's credibility:

– Pain clinic records (from HCH) begin (*sic*) in January 1999 reveal several "no shows" annotated, suggesting the pain alleged was not at a level to require additional treatment and casting doubt on Plaintiff's credibility. (Tr. 15)

– . . .(T)he claimant took a three minute bathroom break after one hour into the hearing, which is inconsistent with statements of requirement bathroom breaks 3-4 times within a one hour time span. In this respect I find the claimant not credible. (Tr. 16).

In addition, the ALJ noted Plaintiff's activities[3], her ability to work in the past despite her urinary problems, and the results of Dr. Hillman's mental status exam indicating intact remote and recent memory with no impairment in attention. (Tr. 16).

17. The first factor cited by the ALJ was appropriate. "[I]n an effort to evaluate the veracity of plaintiff's contention that his pain was so severe as to be disabling," the ALJ may consider the frequency of plaintiff's attempts to relieve pain. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir.2000).

18. With regard to the second factor, the ALJ misheard or misinterpreted Plaintiff's testimony concerning frequency of urination. She testified she needed to urinate every 45 minutes to one hour, which is consistent with the ALJ's own observation. (Compare Tr. 299-300 with Tr. 16).

19. With regard to the remaining factors, the ALJ, accurately recounted Plaintiff's daily activities,

---

[3]"(D)aily activities include personal care activities, light housework such as dishwashing, sweeping, laundering, vacuuming, some cooking, and bed making. She continues to operate a motor vehicle and drives herself to medical appointments." (Tr. 16).

which can not be termed "minimal," her statement that she had been able to work in the past despite her urinary problem (Tr. 300-301) and Dr. Hillman's mental status observations which contradicted Plaintiff's testimony that she suffered from an inability to concentrate, disorientation and poor memory. (Tr. 284, 307-308).

20. I find that the ALJ's credibility determination is supported by substantial evidence, despite his misinterpretation of Plaintiff's testimony with regard to frequency of urination.

### III. The ALJ Failed to Apply Proper Legal Standards at Step Five of the Sequential Evaluation Process.

21. It is undisputed that Plaintiff can not return to her past relevant work. (Tr. 17, 310). Accordingly, the Commissioner had the burden of showing that she "retains the capacity to perform an alternative work activity and that this specific type of job exists in the national economy." *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984). In this case, the ALJ utilized the testimony of a vocational expert ("VE," herein) to meet this burden.

22. The ALJ posed hypothetical questions to the VE. Hypothetical questions must reflect the impairments and limitations that are borne out by the evidentiary record. *Decker v. Chater* 86 F.3d 953, 955 (10th Cir. 1996). The VE was asked to assume a individual of Plaintiff's age, education and vocational history, who had the exertional ability for light work, but with additional limitation and deformity of the right hand. (Tr. 309-310). These limitations were based on the residual functional capacity evaluation prepared by agency physicians. (Tr. 173-181). The VE, referring to the job criteria contained in the *Dictionary of Occupational Titles* ("*DOT*," herein), testified that such an individual could not perform Plaintiff's prior job of Cashier (DOT 211.462-010) because of "manipulation problems, grasping," but would be able to perform the jobs of Information Clerk (DOT

237.367-010) and Surveillance System Monitor (DOT 237.367-010). (Tr. 310).

23. The *DOT* does not rate jobs in terms of "manipulation" or "grasping." It does, however, list handling and fingering demands of various jobs. The handling demands for Cashier and Information Clerk are identical (frequent, meaning 1/3-2/3 of the time), while the fingering demands for Information Clerk are less than that for Cashier (occasional, meaning up to 1/3 of the time, as compared to frequent).

24. There is absolutely nothing in the record which would permit meaningful review of the different DOT criteria as they apply to Plaintiff's manipulative limitation. Perhaps for this reason Defendant advances no argument in support of the ALJ's finding that Plaintiff retained the RFC for the job of Information Clerk. Instead, Defendant contends that the job of Surveillance System Monitor, which has no fingering or handling demands, exists in significant numbers in the national economy.

25. The VE testified that in the region (New Mexico), there were 114 light and sedentary jobs as a surveillance systems monitor, while in the national economy there were 11,450 light and sedentary jobs. (Tr. 310). Plaintiff contends that the number of jobs available in New Mexico is not "significant," rendering her disabled as a matter of law.

26. The Social Security Act provides in part that an individual shall be considered under a disability only if his or her impairment or impairments:

> . . . are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists *in the national economy*, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), *"work which exists in the national economy" means work which exists in significant numbers*

*either in the region where such individual lives or in several regions of the country.*

42 U.S.C. §423(d)(2)(A). See also 20 C.F.R. §§416.961, 416.966(a) (emphasis added).

27. The Tenth Circuit "[h]as never drawn a bright line establishing the number of jobs necessary to constitute a 'significant number' ... [because] each case should be evaluated on its individual merits." *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir.1992). "The decision (as to whether work exists in significant numbers) should ultimately be left to the [ALJ's] common sense in weighing the statutory language as applied to a particular claimant's situation." *Id.*, quoting *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988).

28. The ALJ combined the jobs of Information Clerk and Surveillance System monitor in finding that a significant number of jobs were available which she could perform. (Tr. 19-20). He did not find that 114 jobs in the regional economy or 11,450 jobs in the national economy constituted a significant number.

29. Accordingly, I recommend that this matter be remanded to the Commission for resolution of the issue of whether 114 jobs in the regional economy, or 11,450 jobs in the nation economy constitute a significant number, considering Plaintiff's situation, pursuant to the criteria set out in *Trimiar, supra.*

**Conclusion**

30. For the reasons stated above, I recommend that Plaintiff's Motion to Reverse and Remand for Rehearing be granted in part, that the decision of the Commissioner denying Plaintiff's application for supplemental security income benefits be reversed, and that this matter to remanded to the Commissioner for additional proceedings consistent with this recommended disposition.

RICHARD L. PUGLISI
UNITED STATES MAGISTRATE JUDGE